Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
  VS.                              )          NO. CR 21-00217 MMC
                                   )
ANDREW JAMES CHAPIN, JUNIOR,       )
                                   )
          Defendant.               )
_____)

San Francisco, California
Wednesday, December 15, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    STEPHANIE M. HINDS
                    Acting United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
          BY:  **SCOTT D. JOINER**
               **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
                    LAW OFFICES OF RANDY SUE POLLOCK
                    120 Montgomery Street, Suite 1800
                    San Francisco, CA  94104
          BY:  **RANDY SUE POLLOCK**
               **ATTORNEY AT LAW**

Also Present:       **ASHLEY POLK, U.S. PROBATION**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

| | |
|---|---|
| 1 | **Wednesday - December 15, 2021**                    **2:17 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---000--- |
| 4 | **THE CLERK:**  Calling criminal case number 21-217, |
| 5 | United States of America versus Andrew James Chapin, Junior. |
| 6 | Will Counsel please step forward and state your |
| 7 | appearances for the record. |
| 8 | **MR. JOINER:**  Good afternoon, Your Honor, Scott Joiner |
| 9 | for the United States. |
| 10 | **THE COURT:**  Thank you. |
| 11 | **MS. POLLOCK:**  Good afternoon, Your Honor, Randy Sue |
| 12 | Pollock appearing with Andrew Chapin who is present. |
| 13 | **THE COURT:**  Good afternoon.  And for the United States |
| 14 | Probation Office? |
| 15 | **MS. POLK:**  Good afternoon, Your Honor, Ashley Polk, |
| 16 | U.S. Probation. |
| 17 | **THE COURT:**  Very good.  Are both sides ready to |
| 18 | proceed? |
| 19 | **MR. JOINER:**  We are, Your Honor. |
| 20 | **MS. POLLOCK:**  Yes, Your Honor. |
| 21 | **THE COURT:**  Okay.  All right.  So let me just indicate |
| 22 | what papers I have in the case to make sure I have everything |
| 23 | that was submitted. |
| 24 | I have the parties' respective sentencing memoranda, both |
| 25 | filed on December 8, and also the probation report prepared by |

1    Ms. Polk that was filed at the start of November.

2        In connection with the Defendant's memorandum, there is a

3    separate filing.  It's an index and exhibits, and I have gone

4    over all of those.

5        Were there any other papers that were filed in conjunction

6    with the hearing, substantive ones, not just, you know,

7    stipulations to continue or whatever.

8            **MR. JOINER:**  No.  I believe that covers it.

9            **THE COURT:**  Nothing?  Okay.

10       So what we have here is, of course, the Defendant's guilty

11   plea and -- in connection with a plea agreement in which -- let

12   me just get that out for a moment.

13                    (Pause in the proceedings.)

14           **THE COURT:**  The Defendant was free to seek variance

15   from the guideline range which he is doing and, in fact, so is

16   the Government; but the Government committed itself to

17   recommending no more than 36 months.

18       There is a difference, as you know, between the

19   calculation the parties made as to the offense level and the

20   calculation that Ms. Polk made as to the offense level.

21       It appeared from my reading of the Government's memoranda

22   that -- or memorandum that they had agreed that Ms. Polk had

23   made the correct calculation.

24       It seemed to me that she had as well, but I want to check

25   with, Ms. Pollock, if you were disputing the calculation that

1   was made by the Probation Office, you could let me know.

2       The difference is at paragraph 31 she came up to start

3   with, with a number 7; and the parties had used a number 6.

4       She also had some grouping the parties didn't do, but

5   ultimately the real change is in that one starting point where

6   she felt since fraud is a covered offense, that it -- it

7   required a number 7 there, not 6.

8       The difference is not so much what the Court would

9   necessarily ultimately do, but it does -- it does, I suppose,

10  set how much of a variance the recommended sentences are.

11          **MR. JOINER:**  Sure, Your Honor.

12      And for the Government, you know, Ms. Polk got it right

13  from our perspective.

14      The parties, I believe, when we were putting together that

15  plea agreement, missed a plus 1 because the bank fraud charge

16  cross referenced to that guideline.

17      So, I think that's where the difference between the

18  calculations come from.

19      So, ultimately the Government agrees that the total

20  offense level is 24, not 23.

21          **THE COURT:**  Yes, that's what I understood.  I wanted

22  to check with Ms. Pollock.  I don't think she had weighed in on

23  it when --

24          **MS. POLLOCK:**  I agree too, Your Honor.

25          **THE COURT:**  Okay.  So what that means, if we look at

what the Probation Office did, then they had a total offense
level of 24; criminal history category of I and the guideline
range as calculated by the Probation Office is then 51 to 63
months.

So, essentially we are dealing with, you know, a higher
guideline range than the parties had initially, I think,
anticipated.

The Probation Office recommends a variance as well.  They
are, as does the Government, recommending a 36-month concurrent
sentence on all the counts essentially, so that it would be 36
months.

The Defendant is asking for 30 months, which is six months
less, two-and-a half years versus three.

You know, I have all the arguments made here.  It's
unusual behavior on Mr. Chapin's part in the sense that
everybody who has known him from before saw him as almost a
role model in many respects.

However, it is not a single act in the sense of somebody
who just kind of abhorrently acts out one time and then goes
back to however they were acting.

I did think it was interesting as to how he got into the
situation he did.

The discussion of how there was one investor who just
wasn't going to accept a losing investment, so to speak, do you
know anything about that from the Government's standpoint,

1    Mr. Joiner?

2          **MR. JOINER:**  I do, Your Honor; and I'm glad you

3    brought it up because it was something I wanted to address.

4          When the Government filed its sentencing memorandum, I did

5    not have the benefit of Mr. Chapin's letter.

6          And we take issue with the way he has characterized this

7    dissent into his fraud.

8          As the Court is aware from his letter, he points the

9    finger at a particular investor and focuses on what he calls a

10   multiyear story of manipulation, threats, and abuse from this

11   investor, not from Mr. Chapin.

12         In fact, in our opinion, the reverse is true.  It was

13   actually Mr. Chapin who was engaging in a multiyear story of

14   manipulation and abuse.

15         And I don't think there is any dispute about the facts in

16   the record, Your Honor.

17         What Mr. Chapin was doing was representing that his

18   company had --

19         **THE COURT:**  No, no, no.  Let me stop you for a minute.

20   I know what he was doing.

21         **MR. JOINER:**  Okay.

22         **THE COURT:**  What I wanted to see is if you had any

23   independent information about his description of the

24   relationship with that particular investor?

25         **MR. JOINER:**  Yes, Your Honor.  And that's -- sorry, it

 1   was a slow wind up for me.

 2          **THE COURT:**  Okay.

 3          **MR. JOINER:**  But the misrepresentations as to that

 4   particular investor, going back to the documents, there were

 5   representations that Mr. Chapin had Apple and Nike and other

 6   large retailers as customers as early as November of 2016.

 7          To the extent there was tension between Mr. Chapin and

 8   this investor and demands and threats from this investor, the

 9   earliest those threats occurred were the end of 2018.

10          So the idea that his fraud only started when this investor

11   demanded a repayment is just false.

12          And part of our recommendation, a large part of it, is

13   based on his early resolution and what I characterize as full

14   acceptance of responsibility.

15          But after reading this letter, I do not believe that's

16   full acceptance of responsibility.

17          We are sticking with our same sentencing recommendation;

18   but this is, I think, a very strong reason not to go any lower

19   than 36 months, Your Honor, because this is just factually

20   wrong.

21          **THE COURT:**  Okay.  Well, let me go back because I want

22   to give, obviously, Ms. Pollock an opportunity to be heard on

23   this as well.

24          But I just want to get the material in front of me as what

25   was represented to me and then see.  Just one moment.

1                          (Pause in proceedings.)

2          **THE COURT:**  All right.  I guess this starts -- the

3     discussion, it starts on the first page of Mr. Chapin's letter

4     to the Court in which he said that he thought he had a deal to

5     finance the company, and he was raising funding but it fell

6     through.

7          And then he said he shared that with his investors.  And

8     most of them, he said, understood it was a startup and that's a

9     risk one takes essentially but one investor didn't.

10         And then he goes on to say that, as you quote, the

11    multiyear story of manipulation, threats, and abuse; he said

12    that this person threatened to lean on his political

13    connections to really, quote-unquote, destroy Mr. Chapin's

14    life.  And he was threatening him in various ways.

15         Your understanding is that that encounter, if it occurred,

16    would have been -- or those encounters, if they did occur,

17    would have occurred after there had already been

18    misrepresentations made?

19         **MR. JOINER:**  That's correct, Your Honor.  To this

20    particular investor there were misrepresentations made about

21    two years prior.

22         Now, there is no question that this investor was insistent

23    and threatening and ultimately got paid back, but I disagree

24    with the characterization that this is what caused the fraud.

25         **THE COURT:**  Okay.  Can you give me the years again

1    then?  In other words, how -- you have information as to when

2    certain misrepresentations were made; correct?

3            **MR. JOINER:**  Yes, Your Honor.

4            **THE COURT:**  All right.  And those are conceded by

5    Mr. Chapin or not?

6            **MR. JOINER:**  I don't -- I would assume so.  I

7    discussed it briefly with his Counsel beforehand to let her

8    know we had an issue with this.  The record, I believe, is --

9            **THE COURT:**  Well, I'm just asking independent of this

10   investor, just what representations were made?

11       Do you understand they were made individually to the --

12   you know, to each investor or made as more of a publication?

13           **MR. JOINER:**  Well, Your Honor, in this particular case

14   I have a very specific e-mail in mind that is dated

15   November 1st, 2016, with a list of vendors.  So that was made

16   directly to this investor.

17           **THE COURT:**  All right.  And that would be with

18   misrepresentations about who was investing in the company?

19           **MR. JOINER:**  Correct, Your Honor.

20           **THE COURT:**  All right.  And then your understanding is

21   that this -- you know, the vociferous response to it came -- or

22   to what happened with the company came after that?

23           **MR. JOINER:**  Well, the first threat I could find --

24   yes, is the short answer.  And the first threat that I located

25   in the record, Your Honor, was in November of 2018, so two

1   years later.

2            **THE COURT:**  Two years down the road, okay.

3        Ms. Pollock, I will give you a chance to talk to your

4   client about that and then we will see.

5                      (Pause in proceedings.)

6            **MS. POLLOCK:**  I'm sorry, Your Honor.

7            **THE COURT:**  Do you want to talk to Mr. Chapin?

8            **MS. POLLOCK:**  We are done.  I'm sorry.

9            **THE COURT:**  Okay.  Well, it was something that caught

10  my attention, and so I wanted to, you know, give you a chance

11  to respond then to Mr. Joiner.

12           **MS. POLLOCK:**  Excuse me.  I'm sorry.

13           **THE COURT:**  Okay.

14                      (Pause in proceedings.)

15           **MS. POLLOCK:**  Mr. -- you know, is it my turn now to

16  talk?

17           **THE COURT:**  Yes, yes.  I was waiting for you just to

18  give you a chance to talk to your client.

19           **MS. POLLOCK:**  Your Honor, regarding the matter dealing

20  with this investor, I discussed that with Mr. Chapin at length

21  when he first gave me a draft of his letter and then before

22  coming -- before it was finalized for inclusion in the

23  sentencing memorandum.

24       And he is going to address the Court and explain the

25  situation because I understand the Government's concerns and --

1          **THE COURT:**  Okay.  All right.  That's fine.

2          **MS. POLLOCK:**  As far as the sentence, though, this is

3     a very unfortunate day, as the Court realizes, for Mr. Chapin

4     and for his parents, who are here today, who have been

5     incredibly supportive of him and continue to support him.

6          Mr. Chapin has a road for his future that he -- that he

7     plans to -- he has two -- several job offers already from his

8     friends.

9          So upon completion of his prison sentence, he intends to

10    start paying back the restitution.

11         He does -- even though he will be going into prison

12    shortly, he does intend to still cooperate with the bankruptcy

13    trustee who is trying to get back money.  And it is my

14    understanding there will be a clawback for this one investor's

15    money.

16         But, I had requested the 30 months.  We -- as I

17    acknowledged, the 36 was -- is a fair resolution.

18         I had discussed it with Ms. Polk, and I leave it to the

19    Court.

20         He just wants to move on with his life, and I would

21    request a recommendation for RDAP.

22         I think he can -- the program will seriously help him and

23    is something that he needs at this point in his life although

24    he has been in a support group that has been helping him too.

25         **THE COURT:**  There was both concern about gambling, I

1    think, and substance abuse.

2         **MS. POLLOCK:**  Correct.

3         **THE COURT:**  Or at least heavy use, if you want to put

4    it that way.

5         The -- leaving out the amount of time for a moment and

6    just looking at Ms. Polk's recommendations as to conditions of

7    supervised release, have you been over those?  And are there

8    any that you feel are inconsistent with the plea agreement or

9    otherwise not appropriate?

10        **MR. JOINER:**  Your Honor, if I could just have a moment

11   to review those specific conditions; and I will give a definite

12   answer on that.

13        **THE COURT:**  Yes.

14                    (Pause in proceedings.)

15        **MR. JOINER:**  Are you talking about Probation's

16   recommendations, Your Honor?

17        **THE COURT:**  Yes.

18        **MR. JOINER:**  Those are fine.  I'm sorry.  I thought

19   the Defense had proposed something that I wasn't tracking.

20        **THE COURT:**  No, no, I wasn't asking that.

21        **MS. POLLOCK:**  We have no objection to them.

22        **THE COURT:**  Okay.  By the way, at such time as I

23   impose judgment, do I have to read every one of these sums out

24   individually in order for it to be an awkward sentence or can I

25   just use the total and say as set forth in the probation

1  report?

2  **MR. JOINER:** I will defer to Probation on that,

3  Your Honor. I think you can order restitution according to the

4  schedule contained in the PSR.

5  **THE COURT:** I think it would be fine to do that.

6  There are quite a few different names that are set out here,

7  and it's my understanding that I can do that; but I just wanted

8  to make sure.

9  **MS. POLK:** You can yes, Your Honor.

10  **THE COURT:** Okay. You know, it is very unfortunate;

11  and I'm pleased that Mr. Chapin's parents are here and that

12  they are standing behind him and that his friends have too.

13  And I did read all their letters. And, of course, they

14  are -- these are people who are educated. They are thoughtful

15  letters. They are well written.

16  And most of the people have known him for quite some time

17  going way back to early schooling and are, you know, very

18  surprised that he has found himself in these circumstances; but

19  once he got in, he just kept digging himself deeper and deeper

20  into the hole.

21  I don't know if there is any more the Defendant can say.

22  And I think the Government has probably said what it wants to

23  also.

24  But if you have anything to add, I didn't mean to cut you

25  off by just posing the one question about the matter that was

1    more attention getting at that point.

2            **MR. JOINER:**  Thank you, Your Honor.  I appreciate

3    that.  Submitted.

4            **THE COURT:**  Okay.  Then let me say this, Mr. Chapin,

5    you have an opportunity to address the Court before judgment is

6    imposed.

7        You don't have to speak.  Your attorney says you would

8    like to do so, and so this would be the time.

9        You may give him a little more access maybe to the mic,

10   Ms. Pollock, just so anybody who is back there including his

11   folks, can hear him.  Okay.

12           **THE DEFENDANT:**  Thank you, Your Honor.

13       I want to -- first, I would like to apologize to the

14   victims in this case, the bank and all of the investors.

15       These are people who believed in me and believed in my

16   ability to execute what I laid out.  They trusted me.  They

17   trusted me with their money, importantly.  And I think about

18   this all day, every day.

19       I also realize that they are not the only victims in this

20   case.

21       I think that everybody who has supported me and my

22   endeavor with the company are also victims in their own way

23   including my business partner, employees, my friends --

24           **THE COURT:**  Want to take a minute?  That's fine.

25                       (Pause in proceedings.)

1        **THE DEFENDANT:**  -- my family, who is here today --

2   sorry, Your Honor -- these are good people.  And with some of

3   them I will never be able to make it right.

4        The last twelve-and-a-half months since my arrest I have

5   really been focusing on what I can do to better my

6   circumstances in the future.

7        Importantly, I have looked within and really asked myself

8   why.  And while it's natural, I think, for a lot of people to

9   point a finger and say, well, if this person didn't do that or

10  if this circumstance were different, you know, I wouldn't have

11  done that.

12       The truth is, Your Honor, it's -- it comes down to my

13  inability to quit and my inability at various points in the

14  company's history to look at it and say this is not working and

15  just be honest with myself but also be honest with those around

16  me.  And that's 100 percent my fault.

17       There can be pressure.  Undoubtedly there was a ton of

18  pressure, but it's not pressure that caused this.  It is my

19  inability to be honest about things not working.

20       I have also -- I spent a lot of time -- we talked a little

21  bit about some habits that were not good or productive for me

22  including a near daily drug habit and sports betting; both of

23  which I have spent a lot of time -- it has not been easy --

24  over the course of the last twelve-and-a-half months

25  addressing.

 1          And I'm proud of the work so far but really looking

 2     forward to continuing that work.

 3          The past year I have spent a lot of time volunteering,

 4     helping out here in the city that I love.

 5          I have assisted with the ongoing bankruptcy, with Benja.

 6     Any time the Government or the trustee of the bankruptcy has

 7     reached out with questions or anything like that, I have

 8     dropped everything that I am doing; and I have jumped to it and

 9     tried to help as quickly as possible because I have created

10     this mess.  And I want nothing more than to help fix it.

11          I have also spent a lot of time planning for re-entry.

12     Custody in my mind is an inevitable truth here.

13          Over the course of the last twelve-and-a-half months, I

14     finished my previously unfinished graduate work.  I have

15     started some technical training; continued to develop my

16     marketing skills.

17          I have joined support groups for white collar offenders to

18     talk to them and learn from their experiences about what they

19     have gone through and how that path has been for them.

20          I have talked to recruiters.  I have really focused on my

21     life after this.

22          And that's, of course, because I want to be a productive

23     and good and contributing member to society; but the bigger

24     piece is that there is restitution owed in this case.  And it

25     is a big number, and it's one that I'm very serious about

1    resolving.

2        Many of the people who I identified as victims earlier I

3    will never be able to make it right with them.  I violated

4    trust.  I have done all that.

5        The financial component of this, though, is something that

6    I can address; and I would like to say here in front of the

7    Court, in front of my family, in front of everybody who is

8    here, that I intend to complete 100 percent of this

9    restitution.  And it will be my number one priority going

10   forward.

11       I pray, Your Honor, that you hear these words.  You see

12   the actions of the last twelve-and-a-half months, and you see

13   someone who has true remorse and is taking ownership here.

14       I also hope that you feel -- really feel my conviction to

15   right these wrongs.

16       I want nothing more than to do so and just want to say

17   that I'm eager to get to work.  Thank you.

18           **THE COURT:**  All right.  Thank you.

19       Well, it's -- you know, it's a well-stated final set of

20   remarks.

21       I do take the matter under submission.  I'm going to rule.

22       I -- I understand what happened here to a certain extent;

23   perhaps, not fully.  I was not in Mr. Chapin's position.

24       He is someone who has essentially never failed before.  He

25   was student body president.  He had all kinds of accolades.

1    He got into business and he wanted to show people he could
2  do it.
3    Unfortunately, not everybody can do it right off the bat;
4  and many successful people have failures at the beginning.
5    But if all of them pretended like it wasn't a failure, we
6  would have a lot more cases here in court.
7    So, what he ended up doing was essentially pretending that
8  he wasn't failing.  I don't think he was one of these people
9  that misled people; certainly didn't intend to do it from the
10 start.
11    And it wasn't that he was necessarily supporting a fancy
12 lifestyle, but he was not prepared to just tell people the
13 truth.
14    And as I said, he just kept digging himself in deeper and
15 deeper and deeper.  And he couldn't get out of it.
16    And eventually, like almost all things of this nature, it
17 is found out.
18    I did say that I was interested in the pressures that he
19 was put under, if he was, by the one investor.
20    However, if the chronology is as the Government says it
21 was, it has less of a bearing on what I would do otherwise.
22 And -- but it's one of the reasons that I wanted to ask you
23 about it.
24    I do think the recommendation both by the Probation Office
25 and the Government is a fair one.

1    And given the fact that the actual guideline range is even

2    higher than originally Counsel thought when they made -- the

3    Government made the commitment it did, I'm going to stay with

4    that recommendation.

5    I recognize it's not a major difference, but six months

6    anywhere is significant to someone who is serving the time.

7    So, I don't make the decision lightly; but I do think that

8    the 36 months is a fair number in this particular case.

9    I do want to say to Mr. Chapin that, again, if you can't

10   meet the goal that you have set out for yourself to repay

11   everybody a hundred cents on the dollar, please don't get into

12   another problem trying to do it.

13   This is a very large sum of money.  And even though he has

14   job prospects -- he has very nice friends who have known him

15   forever and think he is a good person at heart and that they

16   are willing to have him working for them and because he is

17   talented -- all of that stands in his good stead.

18   In the same light, he may not be able to accomplish this.

19   And if he can't, as long as he does the best that he can to do

20   it, he may just have to accept that as being adequate.

21   If he can do it without running into a real problem, then

22   more power to him; but this is a pretty substantial sum of

23   money for an individual, even a young one who has a lot of time

24   to make amends.

25   So at this time pursuant to the Sentencing Reform Act of

1  1984, it is the judgment of the Court that the Defendant is
2  hereby committed to the custody of the Bureau of Prisons for a
3  term of 36 months.

4      That is the same number of months on each of the three
5  counts; all to be served concurrently.

6      Upon his release, he will be on supervised release for
7  three years, which is three years on all the counts; again,
8  running concurrently.

9      And within 72 hours of his release, he is to report to the
10 nearest United States Probation Office.

11      While on supervised release, he is not to commit another
12 federal, state, or local crime.  He is to comply with the
13 standard conditions adopted by the Court.

14      He is to refrain from any unlawful use of controlled
15 substances and to submit to a drug test within 15 days of his
16 release and two periodic tests thereafter.

17      He is also to comply with the following special
18 conditions.  And there are quite a few of them.

19      First, he is not to have any contact with the victims
20 unless otherwise directed by the Probation Office.

21      There may be a reason to do so but not to take it into his
22 own hands.  Get approval first.

23      He is to pay any restitution and special assessment that
24 is imposed by the judgment and remains unpaid at the
25 commencement of the term of supervised release.

1        There were three felony counts, so the Court is required
2   to impose $100 as to each.  And that's $300.

3        I will make some orders about paying that smaller sum and
4   also the larger; but if he can get the smaller out of the way
5   early, which I think he has the funds to do or his folks do,
6   that he should just get that out of the way so it doesn't
7   interfere with his credit at the prison.

8        He is not to open any new lines of credit and/or incur any
9   new debt without prior permission of the Probation Office.

10       He is to provide the probation officer with access to
11  financial information.  It can include tax returns.

12       And he has to authorize them to conduct credit checks and
13  obtain copies of his income tax returns.

14       He is not to engage in any form of gambling including but
15  not limited to lotteries, online wagering, sports book, sports
16  betting.

17       You must not enter any casino or other establishment where
18  gambling is the primary purpose; so that includes racetracks,
19  offtrack betting, and -- those are just examples.  It's not an
20  exhaustive list.

21       He must not engage in any -- I'm sorry -- he is to
22  participate in a mental health treatment program as directed by
23  the Probation Office.  They may feel that this is appropriate
24  or not.

25       If they do, then he needs to pay all or part of the cost

as they deem appropriate; but, of course, never to exceed the total cost of counseling.

He is to cooperate in the collection of DNA as directed by the probation officer.

He will be subject to a search.  This is what the Government, as I mentioned, calls a special search condition.  I probably mentioned this earlier when he entered his plea.

It is not really special anymore.  It is pretty much their standard which is that he must submit his person, residence, office, vehicle, electronic devices, their data, including cell phones, computers, and electronic storage media or any property under his control to a search by a probation officer or any federal, state, or local law enforcement officer at any time, with or without suspicion or probable cause.

Failure to submit to such a search may be grounds for revocation, and the Defendant should warn -- and I would direct him to warn any residents that the premises may be subject to search.  Otherwise, there may be some type of unnecessary and undesirable confrontation.

He is to participate in a program of testing and treatment for drug abuse as directed by the probation officer until such time as he is released from that condition, if they feel it is appropriate.

He is to pay all or part of the cost in an amount not to exceed the total cost of testing and treatment.

1    Again, the actual amount, if any, will be determined later

2    by the probation officer based on his circumstances at that

3    time.

4    He doesn't have the ability to pay a fine particularly if

5    he is going to try to make good on this restitution, which is a

6    sum that he is ordered to pay.  And the amount $8,069,900 to

7    the victims in the -- as listed and in the amounts as set forth

8    in the probation report that I referenced earlier.

9    During imprisonment, payment of restitution is due at the

10   rate of not less than $25 per quarter through the Bureau of

11   Prisons Inmate Financial Responsibility Program.

12   Once the Defendant is on supervised release, then the

13   restitution is to be paid in monthly payments of not less than

14   $200 or at least 10 percent of earnings, whichever is greater

15   to commence no later than 60 days from placement on

16   supervision.

17   Again, if for any reason that term or that particular

18   provision is not appropriate, given whatever his situation is

19   at that time, it can be modified with a request made to the

20   Court.

21   And as set forth in the probation report, regardless of

22   whatever schedule I set, the U.S. Attorney's Office is free to

23   pursue collection through all available means that they have

24   under the applicable statutes.

25   Any payments, whether it be of the amount of the special

1  penalty assessment or the restitution, if those payments are

2  made, they are to be made to the Clerk of the Court through

3  the -- attention to the financial unit here at 450 Golden Gate

4  Avenue as set forth in the probation report.

5      Now, I will recommend that the Defendant be allowed to

6  participate and be admitted to the -- what is called by acronym

7  RDAP program.  And I probably don't remember all the words that

8  go into making up that acronym, but he may well qualify.

9      If he does, he will also be eligible in all likelihood to

10  shorten his sentence a bit if he successfully completes that

11  program.

12     Does he wish to have the Court recommend any geographical

13  location?

14         MS. POLLOCK:  Yes, Your Honor.  The Eastern Region of

15  the United States and specifically if Your Honor could

16  recommend the Federal Correctional Institution in Danbury,

17  Connecticut.  And if that's not available, the one in Berlin,

18  New Hampshire.

19     Those are closest to his parents' home, and they do have

20  RDAP program there.

21         THE COURT:  One is Danbury, Connecticut?

22         MS. POLLOCK:  Yes.  And then Berlin, New Hampshire.

23         THE COURT:  I don't ordinarily pick a particular

24  facility; but all things considered here, I will accept that

25  recommendation.

1      I do recommend that if he is eligible, that he be placed

2 either in Danbury, Connecticut FCI or FCI --

3      **MS. POLLOCK:** It is FCI.

4      **THE COURT:** -- Berlin, New Hampshire, to be able to

5 facilitate visits from his immediate family.  Okay.

6      Now, were there any other matters that need to be taken

7 up?

8      **MS. POLLOCK:** If there could be a stay on surrender

9 until February 1st, a voluntary surrender.

10      **THE COURT:** There will be some time for him to be

11 designated in any case.  And given the holidays, that does not

12 seem out of line.

13      Let me ask, Mr. Joiner, if you have any concern.

14      **MR. JOINER:** No objection, Your Honor.  We would just

15 ask that the conditions that were imposed on his pretrial

16 release remain in place until his self surrender.

17      **THE COURT:** That's fine.  There will be a stay of

18 surrender until February 1, 2022.

19      He is to surrender either to the facility that he has been

20 designated to or to the U.S. Marshal Service here.

21      And if he hasn't been designated, you can seek some type

22 of extension if you need it, Ms. Pollock.

23      **MS. POLLOCK:** What time would the surrender be by,

24 Your Honor?

25      **THE COURT:** Well, it is 2:00 o'clock here.  And if he

1   were back in Connecticut, I'm not sure how our order would be

2   in that respect.

3       We have one that I'm prepared to sign.  So, I think if he

4   just gets there that day, that's probably all right.

5       I don't think there is anything else.  Anything from the

6   Government?

7           **MR. JOINER:**  No.  Thank you, Your Honor.

8           **THE COURT:**  Probation?

9           **MS. POLK:**  No, Your Honor.  Thank you.

10          **THE COURT:**  All right.  Thank you.  That completes

11  this matter.  Thank you.

12                  (Proceedings adjourned at 2:52 p.m.)

13                          ---oOo---

1

2

3                    <u>**CERTIFICATE OF REPORTER**</u>

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, December 16, 2021

8

9

10

11   _____

12        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
           United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25